UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | Case No. 1:23-cr-00207 (DLF) |
| v. : | |
| : | |
| BRANDON SCOTT PEERY : | |
| : | |
| Defendant : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Brandon Peery to thirty-six months of probation with 14 days of intermittent incarceration, and restitution in the amount of $500.

I.   **Introduction**

Defendant Brandon Peery, 35, participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

1

Peery pleaded guilty to violation of 18 U.S.C. § 1752(a)(1). The government's recommendation is supported by the defendant's (1) decision to enter the United States Capitol building through the Parliamentarian door, a door that he watched other rioters forcibly breach just seconds earlier; and (2) decision to re-enter the United States Capitol for a second time; leaving the building only after he noted that police officers were blocking access further into the building.

The Court must also consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of Peery's crime support a sentence of thirty-six months of probation with 14 days of intermittent incarceration, and restitution in the amount of $500 in this case. The government's recommendation also accounts for the defendant's fulsome pre-arrest confession to federal agents and his timely acceptance of responsibility in this case.

II.     **Factual and Procedural Background**

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF No. 18.

*Defendant Peery's Role in the January 6, 2021 Attack on the Capitol*

On January 2, 2021, the defendant posted a YouTube video discussing his plans to travel to Washington, D.C., on January 6, 2021, to attend a rally in support of then-President Donald Trump. In that video, Peery indicated that he was aware that January 6th was the date when the Electoral College vote count would be certified at the United States Capitol. Peery traveled to

Washington, D.C. on a charter bus from his then-home in Wisconsin. Peery walked from former President Trump's speech at the Ellipse to the Capitol. He was wearing a black, knit cap, face mask, and black jacket over a royal blue jacket, and with a red Trump flag tied around his neck like a cape. ECF No. 18 ¶ 8.

Once Peery arrived at the Capitol, he made his way through a large mob of rioters that had assembled on the West side of the building. He then moved up a flight of stairs with the mob to the Upper West Terrace and the Northwest Courtyard. At approximately 2:42 p.m., Peery watched as rioters violently breached the Parliamentarian door near the West stairs and room S131. Undeterred, Peery followed the mob through the Parliamentarian door, entering the building at 2:43 p.m. As Peery entered, he turned and gestured vigorously with his hand to rioters behind him, seemingly urging other rioters to follow. Image 1, below, is a screenshot of CCTV surveillance video (Exhibit 1) capturing the gesture.



Image 1, Screenshot of Exhibit 1 (timecode 2:43:00 PM)

As he advanced down the hall, Peery observed rioters forcibly break open the doors to an office. At approximately 2:43 p.m., Peery was part of the crowd of rioters pushing down the hall further into the Capitol Building. The crowd was then pushed back the other direction by police using riot control agents, and Peery turned around and headed back towards the Parliamentarian door. At that time, he pulled the flag cape off his neck and shortly thereafter removed his face mask. At about 2:49 p.m., Peery was repelled back out the Parliamentarian door and exited the Capitol building onto the Northwest Courtyard. *See* Exhibit 2. Images 3 and 4, below, are screenshots of Peery from a CCTV surveillance video (Exhibit 2) in the hallway near the Parliamentarian doors:



Images 2 and 3, Screenshots of Exhibit 1 (app. 2:43:00 PM)

Peery was not finished. Just minutes after exiting the building, he decided to reenter the building a second time. He moved from the Northwest Courtyard through the Senate Wing door,

4

into the Capitol building near room S109, at approximately 2:56 p.m. Image 5, below, is a screenshot of Peery reentering the Capitol building a second time through the Senate Wing door:



Image 4, Screenshots of Exhibit 3 (timecode app. 2:56:40 PM)

Peery walked forward from the door and across the vestibule inside the Senate Wing door. At approximately 2:57 p.m., he appeared to take a video of the crowd of rioters in the area. He then turned to his right and moved to the southwest corner of the vestibule, where he remained until approximately 3:02 p.m. He then walked down the hall in the direction of the Old Supreme Court Chamber.

Approximately one minute later, Peery returned to the same vestibule area, where he again stood in the southwest corner. He exited the building through the west Senate Wing door at approximately 3:13 p.m. In total, Peery was inside the Capitol building for 23 minutes on January 6, 2021.

*Peery's Pre-Arrest Interview with the FBI*

On May 16, 2022, following a call from the FBI, Peery contacted the FBI and agreed to come in immediately for an interview. Perry confirmed that he posted a YouTube video on January 2, 2021 discussing his plans to travel to Washington, D.C. on January 6, 2021 to "stand with President Trump" and to "partake and to pray" by attending the political rally at the Ellipse. Peery traveled to Washington, D.C. by charter bus from the Wisconsin-Michigan border and arrived in Washington, D.C. at approximately 8 a.m. on January 6.Peery stated that that, prior to traveling to D.C., he had no plans to enter the Capitol. Peery walked with "three or four" people from the bus from former-President Trump's speech down Pennsylvania Avenue to the Capitol and was at the Capitol for approximately one and a half hours. Peery confirmed that he entered the Capitol, and he marked his route through the Capitol grounds and building on a map provided by the FBI. After the riot, Peery returned to the charter bus and departed D.C. for Wisconsin at 4:30 PM on January 6, 2021.

Peery stated that when he arrived at the Capitol he observed "Trump supporters" yelling at an individual in a suit who he believed was a "lawmaker." He further observed individuals being "teargassed." He observed rioters climbing the scaffolding. The three or four individuals with whom Peery had walked to the Capitol decided to return to the Ellipse to see the remainder of President Trump's speech, but Peery decide to remain Capitol grounds.

Peery stated that once "word of mouth" revealed that then Vice President Pence would certify the results of the election, "mob mentality" ensued and members of the crowd, including Peery, began to advance toward the Capitol. Peery noted that he ran into a former schoolmate named "Tyler" at the Capitol on January 6, but refused to further identify this individual, noting that "Tyler" had already been contacted by law enforcement regarding January 6.

Peery stated that individuals were beginning to break down doors when he arrived at the Capitol building and that he was at the "forefront" of the group. Peery stated that he entered through a door that was "broken in" and noted that a window in the area had been broken as well. Peery stated that he observed individuals "meandering," "taking pictures," and "smoking marijuana." Peery stated that it was "more aggressive" prior to and during the "initial breach," but that "20 or 30 minutes later" when he exited the Capitol, it was "calmer." Peery then stated that he re-entered the Capitol through another door and entered an area filled with offices, and that he observed other rioters seemingly "break into an office specifically for a reason."

Peery stated in this interview that he wore his mask so as to not be identified. He stated that: "the emotions got the best of me" and "with this mob mentality, I lost my emotions that day." Peery expressed at that time that he wished to accept responsibility for his conduct that day, and wanted to deal with any legal repercussions sooner so as to have any penalties "said and done."

*The Charges and Plea Agreement*

On June 23, 2023, the United States charged Peery by a four-count Information with violating 18 U.S.C. § 1752(a)(1), Entering and Remaining in a Restricted Building or Grounds; 18 U.S.C. § 1752(a)(2), Disorderly and Disruptive Conduct in a Restricted Building or Grounds; 40 U.S.C. § 5104(e)(2)(D), Disorderly Conduct in a Capitol Building or Grounds; and 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building. On December 18, 2023, pursuant to a plea agreement, Peery pleaded guilty to Count One of the Information, charging him with a violation of 18 U.S.C. 1752(a)(1). By plea agreement, Defendant agreed to pay $500 in restitution to the Architect of the Capitol.

### III.  Statutory Penalties

Peery now faces a sentencing for violating 18 U.S.C. § 1752(a)(1). As noted by the plea agreement and the U.S. Probation Office, Peery faces up to twelve months of imprisonment and a fine of up to $100,000. The defendant must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

### IV.  The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR.

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2B2.3(a)) | +4 |
| Specific Offense Characteristics (U.S.S.G. §2B2.3(b)(1)(A))[2] | +2 |
| Chapter Four Adjustment | -2 |
| Acceptance of Responsibility (USSG §3E1.1(a)) | <u>-2</u> |
| Total Adjusted Offense Level | 2 |

*See* PSR at ¶¶ 31 to 42.

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who

8

have no criminal history points and who meet certain additional criteria. Section 4C1.1 will be in effect at the time of sentencing in this matter, but was not considered at the time the parties entered into the plea agreement.

While the Government concedes that Section 4C1.1 applies to Peery, the Court should vary upward by two levels to account for the reduction under 4C1.1. An upward variance is necessary because the January 6 riot was a violent attack that threatened the lives of legislators and their staff, interrupted of the certification of the 2020 Electoral College vote count, did irrevocable harm to our nation's tradition of the peaceful transfer of power, caused more than $2.9 million in losses, and injured more than one hundred police officers. Every rioter, whether or not they personally engaged in violence or personally threatened violence, contributed to this harm. I*See, e.g., United States v. Rivera*, 21-cr-60 (CKK), ECF No. 62 at 13 ("Just as heavy rains cause a flood in a field, each individual raindrop itself contributes to that flood. Only when all of the floodwaters subside is order restored to the field. The same idea applies in these circumstances. Many rioters collectively disrupted congressional proceedings and each individual rioters contributed to that disruption.  Because [the defendant's] presence and conduct in part caused the continued interruption to Congressional proceedings, the court concludes that [the defendant] in fact impeded or disrupted the orderly conduct of Government business or official functions").  Thus the defendant's conduct caused a significant disruption to a vital governmental function, warranting an upward variance. *See United States v. Eicher*, No. 22-cr-038 (BAH), Sentc'g Hrg. Tr. at 48 (varying upward by two levels to offset the Section 4C1.1 reduction).

Moreover, the Sentencing Commission enacted § 4C1.1 based on recidivism data for offenders released in 2010. *See* U.S. SENT'G COMM'N, RECIDIVISM OF FEDERAL OFFENDERS RELEASED IN 2010 (2021), available at https://www.ussc.gov/research/research-

9

reports/recidivism-federal-offenders-released-2010. Given the unprecedented nature of the Capitol attack, there is no reason to believe this historical data is predictive of recidivism for defendants who engaged in acts of political extremism on January 6. This is particularly so given the degree to which individuals, including defendants who have been sentenced, continue to propagate the same visceral sentiments which motivated the attack. *See, e.g.*, *United States v. Little*, No. 21-cr-315 (RCL), ECF No. 73 at 4 ("The Court is accustomed to defendants who refuse to accept that they did anything wrong. But in my thirty-seven years on the bench, I cannot recall a time when such meritless justifications criminal activity have gone mainstream.").

The U.S. Probation Office calculated Peery's criminal history as a Category I. PSR at ¶ 45. Accordingly, the U.S. Probation Office calculated Peery's total adjusted offense level, after acceptance, at 2, and his corresponding Guidelines imprisonment range at zero to six months. PSR at ¶ 92. Peery's plea agreement contains an agreed-upon Guidelines' calculation that mirrors the U.S. Probation Office's calculation.

Here, while the Court must consider the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and fairness.

V.  **Sentencing Factors Under 18 U.S.C. § 3553(a)**

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the

Section 3553(a) factors weigh in favor of a short sentence of incarceration and a longer term of probation.

### A. The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Peery's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Peery, the absence of violent or destructive acts is not a mitigating factor. Had Peery engaged in such conduct, he would have faced additional criminal charges.

One of the most important factors in Peery's case is that he observed the full force of the violence that unfolded at the Capitol on January 6, 2021, and still chose to enter the Capitol building. Peery observed other rioters break through the Parliamentarian door. Within moments of observing that breach, Peery chose to  the Capitol through the same door. Additionally, Peery entered the Capitol not once, but twice, after observing some of the worst of the riot's destruction. Peery could have chosen to turn back prior to participating in the riot. Indeed, the individuals that Peery traveled to the Capitol building with from the Ellipse turned back when they observed the violence of the mob outside the Capitol, Peery, instead, advanced forward.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of intermittent incarceration, and restitution in the amount of $500in this matter.

### B. Peery's History and Characteristics

Peery has no criminal history. He reports no substance abuse or mental health issues. He characterizes his childhood as "great" and has good relationships with his parents and sibling. Peery similarly characterizes his marriage as "growing and constantly getting better." He has a Bachelor of Science degree and is currently employed as a real estate agent.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a short sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be

deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of the recommended short term of incarceration. Peery observed rioters forcibly breaking through the Parliamentarian door and decided to enter the Capitol building through that same door just seconds later. He entered the Capitol building unlawfully on January 6, 2021, not once, but twice. He advanced toward the Capitol even after those with whom he was traveling turned back from the riot.

The Court must sentence Peery in a manner sufficient to deter him specifically, and others generally, from going down that road again.

### E. The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[3] This

---

[3] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Court must sentence Peery based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Peery has pleaded guilty to Count One of the Information, charging him with Entering and Remaining in a Restricted Building and Grounds, in violation of 18 U.S.C. § 1752(a)(a). This offense is a Class A misdemeanor. 18 U.S.C. § 3559. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct".  So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Daniel Leyden*, 21-cr-314 (TNM), Sent. Hrg. Tr. at 38 ("I think the government rightly points out generally the best way to avoid unwarranted sentencing disparities is to follow the guidelines.") (statement of Judge McFadden). If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because

it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Nicholas Hendrix*, 21-CR-426 (CKK), the defendant pleaded guilty to 40 U.S.C. § 5104(e)(2)(G). Hendrix was a veteran suffering from PTSD who entered the Capitol through the East doors and stayed inside for 90 seconds. He returned to the East doors intending to re-enter the Capitol, remained outside recording, and then left after officers sprayed him. The government recommended a split sentence including 14 days in jail; Judge Kollar-Kotelly exceeded the government's recommendation and imposed a sentence of 30 days of jail and 36 months of probation.

In *United States v. Jason Hyland*, 21-CR-50 (CRC), the defendant pleaded guilty to 40 U.S.C. § 5104(e)(2)(G). Hyland went back to at his hotel after attending the rally at the Washington Monument, and saw news that explicitly reported violent activity at the Capitol with police being overwhelmed. Despite this, he went to the Capitol, approaching and entering through the East doors. He was inside for 90 seconds. After exiting, he yelled at police, calling them traitors. He was highly remorseful and, like Peery, gave a recorded statement to the FBI before arrest, and consented to a search of his phone. Judge Cooper sentenced Hyland to 7 days of jail, $500 in restitution, and a $4,000 fine.

In *Unites States v. Jack Griffith*, 21-CR-00204 (BAH), the defendant pleaded guilty to 40 U.S.C. § 5104(e)(2)(G) – a Class B misdemeanor. Griffith entered through the Senate Wing door and walked to the Crypt, where he posed for a photo with his fist raised, and then exited at Senate Wing door, having been inside the Capitol for approximately ten minutes. Griffith demonstrated a lack of remorse after January 6, trivializing the criminal proceedings. Even six months after his arrest and mere weeks before he pled guilty, he produced Tik Tok videos in which he blamed the "main-stream media' for his actions on January 6 and promoted conspiracy theories. Judge Howell sentenced Griffith to 3 months of home detention, 36 months of probation, and $500 in restitution. Although Peery has shown more contrition for his conduct at the Capitol, he was in the building for far longer than Griffith and entered the building a second time after initially exiting the building.

With respect to similarly-situated cases before this Court, the government is aware of this Court's sentence in *United States v. Jackson Kostolsky*, 21-CR-00197 (DLF), where the defendant pleaded guilty to 40 U.S.C. § 5104(e)(2)(G). Kostolsky scaled a wall, entered the building approximately 30 seconds after the initial breach, said he had fun and that politicians were crawling in fear, lied to FBI, and deleted video of the event. This Court sentenced Kostolsky to 30 days of home detention, 36 months of probation, and $500 in restitution. Kostolsky was inside the Capitol for approximately ten to thirteen *seconds*, and he exited when Capitol Police yelled, "Get out!" Here, Peery was inside the Capitol for over twenty minutes, and entered the building twice, sufficiently underscoring the need for more punishment and appreciation for the disruption he played as a member of the mob. or wfHis conduct warrants more serious consequences.

Similarly, the government is aware of this Court's sentence in *United States v. Chase Allen*, 22-CR-000361 (DLF). In that case, the defendant pleaded guilty to 40 U.S.C. § 5104(e)(2)(F).

16

Allen stomped on media equipment in a media staging area outside the Capitol; he never entered the Capitol building. This Court sentenced the defendant to the same sentence requested here by the government; although Peery did not participate in an act of violence outside of the Capitol, he saw firsthand the violence that occurred during the initial breach of the Parliamentarian door and proceeded into the Capitol nevertheless – not once, but twice. While no one case is directly dispositive, a short sentence of intermittent confinement sends a proper message: leniency for contrition and the defendant's ability to maintain employment and a stable support structure, but punishment and deterrence for a serious criminal act.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

VI.   **Restitution**

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639

F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[4] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Peery must pay $500 in restitution, which reflects in part the role Peery played in the riot on January 6.[5] Plea Agreement at 8. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023." *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) Peery's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR at 8.

---

[4] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[5] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

VII.    **Conclusion**

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Peery to thirty-six months of probation with 14 days of intermittent incarceration, and restitution in the amount of $500. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Peery's liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

                                                Respectfully submitted,

                                                MATTHEW M. GRAVES
                                                United States Attorney
                                                D.C. Bar No. 481052

                            By:     s/ *Kelly E. Moran*
                                        Assistant United States Attorney